Pope and others *v.* THE SWISS LLOYD INS. Co.

(*District Court, D. California.* October 13, 1880.)

1. SEAWORTHINESS—IMPLIED WARRANTY—BREACH—VESSEL UNPROVIDED WITH GROUND-TACKLE REASONABLY FIT FOR THE EXIGENCIES OF A VOYAGE—CIVIL CODE OF CALIFORNIA, §§ 2681, 2683.

Libel on Policy of Insurance.

*Hall McAllister,* for libellants.

*Milton Andros,* for respondent.

HOFFMAN, D. J. Section 2681 of the Civil Code of California is as follows: "In every marine insurance upon a ship, or freight or freightage or upon anything which is the subject of

---

*Rule 53 is as follows: " Whenever a cross libel is filed upon any counter claim arising out of the same cause of action for which the original libel was filed, the respondents in the cross libel shall give security in the usual amount and form to respond in damages, as claimed in said cross libel, unless the court, on cause shown, shall otherwise direct; and all proceedings upon the original libel shall be stayed until such security shall be given."

marine insurance, a warranty is implied that the ship is sea-worthy."

Section 2683: "When the insurance is made for a speci-fied length of time, the implied warranty is not complied with unless the ship be seaworthy at the commencement of every voyage she may undertake during that time."

The policy in this case contains the following clause: "*Thir-teenth.* It is hereby further agreed by and between the assured. and insurers that the provisions of the Civil Code of California shall be conclusive and binding as regarding the warranty of seaworthiness, liability of insurers in case of prior, subse-quent, or simultaneous insurance, and such other questions as are therein legislated upon and not otherwise provided for in this policy." The provisions of the Code thus became doubly obligatory upon the parties. In the great case of *Gibson* v. *Small,* 4 House of Lords Cases, 353, it was finally settled, by the law of England, that on a time policy effected on a vessel then at sea there is no implied condition that the ship should be seaworthy on the day when the policy attached.

Whether, in a time policy, there is not an implied warranty of seaworthiness at the commencement of the risk, so far as it is in the owner's power to effect it, and whether, where several voyages are contemplated, the owner is not bound to exercise reasonable care and pains to repair any damages the vessel may have sustained, and to put her in a seaworthy condition before commencing a new voyage, was not decided.

Even if it be considered that in such cases there is no tech-nical warranty of seaworthiness, yet, if the ship should come into a port in a damaged condition before or after the commencement of the risk, and the owner or his agents neg-lect to make reasonable and practicable repairs, and the ves-sel be lost in consequence, it would seem that policy, hu-manity, and due regard for the rights of shippers should forbid a recovery by the owner from the insurers for a loss attributable to the insufficiency of the ship. See opinion of Lord St. Leonards in *Gibson* v. *Small, ubi supra;* opinion of Lord Campbell, *contra.* Also opinion of Mr. Justice Grier in

*Jones* v. *The Ins. Co.* Wall. Jr. 280–1. In this state these questions are, as we have seen, definitely settled by the *lex loci contractus.*

I have made the foregoing observations because it seemed to be supposed at the hearing that the provisions above cited of our Code were a startling and unprecedented innovation upon well settled and universally acknowledged principles—*First,* as the law of the place where the contract was made and where it was to be executed, (1 Parsons Ins. 132; *Cox* v. *U. S.* 6 Pet. 203; 1 Gall. 371;) and, *secondly,* because the obligation of that law was expressly recognized and agreed to by the parties to the contract.

The schooner Caroline Mills was insured at this port for one year from the fifteenth of April, 1878, "to be engaged as an inter-island trader among the Sandwich Islands." She proceeded from this port to Hilo, Sandwich Islands, where, by direction of her owner, she commenced a voyage from Hilo to Honolulu *via* the way ports. On the ninth day of the voyage, after stopping and discharging cargo at several way ports, she was driven ashore and totally lost at the port of Honokoa.

The defence set up is breach of the implied warranty of seaworthiness, in this: that the vessel was not provided with ground tackle reasonably fit to perform the services, and to meet the ordinary exigencies of the voyages contemplated by the parties.

This is the only issue in the case, and upon it the evidence leaves, in my judgment, little room for doubt.

1. It is not denied that at the owner's suggestion the master "re-enforced" his chain cables by attaching to the anchors six-inch hawsers. This arrangement the experts condemn as improper and inadmissible, partly from the impossibility of dividing the strain with any approach to equality between a chain cable and a hempen hawser, owing to the great difference in elasticity of the materials of which they are composed, and partly from the liability of the hawsers to become chafed, or be cut by the chain or by rocks on the bottom—a danger more than ordinarily great in the inter-island navigation of

the Hawaiian islands, owing to the presence, almost invariably, of coral reefs   The fact that this mode of strengthening his ground tackle was resorted to, seems to involve the tacit admission that the cables alone were insufficient.

The master himself testifies: "I knew the chains were old and weak, so I attached a hawser to the anchors to strengthen the chains." The mate, whose testimony is in some respects more favorable to the libellants than that of the master, says: "The reason the hawsers were attached to the anchors was because the chain cables were weak."

2. The loss of the vessel does not appear to have been caused by any sudden, unforeseen, or irresistible violence of wind or sea. No storm prevailed. It is even doubtful whether the trade winds which caused the vessel to part her cables blew with any unusual violence.

The master, who had been as sailor and master engaged in the inter-island navigation for 30 years, says: "The wind was as usual for that place. Easterly trade winds, moderately strong, and the usual long, heavy swell; and the surf on the rocks was not high." And he adds: "If the chains had held, the vessel would have been in no danger. The weather was perfectly safe for anchorage off Honokoa. I have anchored there in much worse weather in safety."

The mate's account of the cause of the disaster is slightly different. He says: "It was occasioned by the wind and weather, which was heavier than usual. The wind was quite high that day; weather bad, sea rough. I have been at that place seven times before; never saw it so rough before. * * The wind was high, and a heavy swell was setting directly on shore. The usual wind is more to the east, which sets the swell along the shore at this place."

It is apparent from this testimony that though the witnesses differ as to whether the wind blew with any unusual strength, yet they both agree in ignoring the existence of any storm or extraordinary violence of the elements which a well-found vessel could not have anticipated and successfully encountered.

It appears from the mate's testimony that when the vessel had approached to within a couple of miles of the shore, the master decided "to stand off shore again and to wait a little longer to see if the weather would allow of his anchoring in safety." This was at 6 A. M. The mate then went below and did not come on deck again until 11:30 A. M., at the anchorage, where the disaster occurred.

I do not understand that the skill and competency of the master are impeached. His experience as master engaged in the inter-island navigation is of 20 years. He is still in the employ, and appears to retain the confidence, of the owner. When, therefore, after deciding to stand off and wait until the weather should permit him to anchor in safety, he resolved to stand in and bring his vessel to anchor, it must be inferred that the state of the wind and weather were such as in his judgment to justify the attempt. The result showed either that he committed an inexcusable blunder in placing his vessel in a position where ground-tackle of the usual and proper strength would be wholly incapable of holding her, or else that she was unprovided with such tackle; for it is to be noted that the vessel can scarcely be said to have come to anchor at all, for the chains and hawsers on both anchors parted almost instantly when the vessel surged upon them.

I think the proofs in the case leave no reasonable grounds for doubt as to which of the alternatives above stated must be adopted, and that the disaster must be attributed to the weakness and insufficiency of the ground-tackle of the vessel, and not to the stupid temerity of the master in exposing his vessel to a visible and obvious peril which he had no right to suppose her capable of encountering.

I have not thought it material to enter upon the inquiry whether the chains with which the vessel was provided were of sufficient size for a vessel of her tonnage engaged in the coasting trade from this port. The fact that it was thought necessary to re-enforce them by hawsers is, as before remarked, an admission that they were not strong enough for the inter-island navigation on which she was about to enter,

and the result showed that they were inadequate to meet the ordinary incidents of that navigation, or perform the service which the master felt justified in expecting of them.

Libel dismissed.